[Cite as *State v. Weimer*, 2016-Ohio-3116.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO


| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2013-L-005** |
| DANNA WEIMER, | : | |
| Defendant-Appellant. | : | |


Criminal Appeal from the Lake County Court of Common Pleas, Case No. 12 CR 000426.

Judgment: Affirmed in part; reversed in part; vacated in part; and remanded.


*Charles E. Coulson*, Lake County Prosecutor, and *Teri R. Daniel*, Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Russell S. Bensing*, 600 IMG Building, 1360 East Ninth Street, Cleveland, OH 44114 (For Defendant-Appellant).


COLLEEN MARY O'TOOLE, J.

{¶1} Appellant, Danna Weimer, appealed from the December 13, 2012 judgment of the Lake County Court of Common Pleas, sentencing her for receiving stolen property, possession of drugs, possession of heroin, possession of cocaine,

possession of dangerous drugs, aggravated possession of drugs, tampering with evidence, aggravated burglary, aggravated murder, and engaging in a pattern of corrupt activity.

{¶2} On June 30, 2014, this court affirmed in part, reversed in part, vacated in part, and remanded the judgment of the trial court. *State v. Weimer*, 11th Dist. Lake No. 2013-L-005, 2014-Ohio-2882 (Grendell, J., concurring in part and dissenting in part with a Dissenting Opinion). Specifically, this court reversed appellant's convictions for aggravated murder and aggravated burglary and remanded the case for a new trial. *Id.* This court also reversed and vacated appellant's conviction for engaging in a pattern of corrupt activity. *Id.* Appellee, the state of Ohio, appealed our decision to the Ohio Supreme Court.

{¶3} On August 25, 2015, the Ohio Supreme Court vacated our entire decision and remanded the matter back to this court for us to consider the evidence of an enterprise in light of *State v. Beverly*, 143 Ohio St.3d 258, 2015-Ohio-219, which was pending at the time of our decision. *State v. Weimer*, 143 Ohio St.3d 418, 2015-Ohio-3378.

{¶4} In accordance with the Ohio Supreme Court's remand, on October 6, 2015, this court ordered the parties to submit briefing on the enterprise issue only. Appellant and the state complied with this court's order and submitted briefs. This case is once again before us for review. It is not clear from the Supreme Court's remand why our entire opinion was vacated as the enterprise issue relates solely to appellant's third and fourth assignments of error. However, for purposes of clarity, we will re-address assignments of error one, two, and five. Upon consideration and for the reasons

2

stated, this court again affirms in part, reverses in part, vacates in part, and remands the judgment of the trial court.

{¶5} This case arose from the burglary of Eleanor Robertson's ("Robertson") home and her death by homicide on June 12, 2012. On August 14, 2012, appellant was indicted by the Lake County Grand Jury on 17 counts involving Robertson and two other victims, Egidius Stroombeek ("Stroombeek") and Paul Hatcher ("Hatcher"): counts 1 and 3, receiving stolen property, felonies of the fifth degree, in violation of R.C. 2913.51(A); counts 2 and 4, receiving stolen property, misdemeanors of the first degree, in violation of R.C. 2913.51(A); count 5, possession of drugs, a felony of the fourth degree, in violation of R.C. 2925.11; count 6, possession of drugs, a felony of the fifth degree, in violation of R.C. 2925.11; count 7, possession of heroin, a felony of the fifth degree, in violation of R.C. 2925.11; count 8, possession of cocaine, a felony of the fifth degree, in violation of R.C. 2925.11; count 9, possession of dangerous drugs, a misdemeanor of the first degree, in violation of R.C. 4729.51(C)(3); count 10, aggravated possession of drugs, a felony of the fifth degree, in violation of R.C. 2925.11; counts 11 and 12, receiving stolen property, felonies of the fourth degree, in violation of R.C. 2913.51(A); counts 13 and 14, tampering with evidence, felonies of the third degree, in violation of R.C. 2921.12(A)(1); count 15, aggravated burglary, a felony of the first degree, in violation of R.C. 2911.11(A)(1); count 16, aggravated murder, an unclassified felony, in violation of R.C. 2903.01(B); and count 17, engaging in a pattern of corrupt activity, a felony of the first degree, in violation of R.C. 2923.32(A)(1).[1] Appellant was appointed

---

1. Appellant's co-defendant and son, Zachary R. Weimer ("Zachary"), was separately indicted, tried, and convicted.

counsel. She waived her right to be present at the arraignment and the trial court entered a not guilty plea on her behalf.

{¶6} Discovery and motion practice ensued. In August 2012, appellant filed various motions, including a motion in limine seeking to exclude certain handwritten letters as well as two motions to suppress. The state filed responses. Following a hearing, the trial court denied appellant's motions to suppress on September 26, 2012.[2]

{¶7} A jury trial commenced on October 1, 2012. At the trial, the state presented 37 witnesses and nearly 300 exhibits. The testimony revealed that Robertson was an active 77-year-old woman who lived alone on Canterbury Drive in Madison Township, Lake County, Ohio. She was known throughout her neighborhood for selling raffle tickets to raise money for various organizations and for paying kids in cash for helping her around her house.

{¶8} In the early morning hours on June 13, 2012, two neighbors, Jerry Deel ("Deel") and Christine Arnold ("Arnold"), noticed that Robertson's garage door was open and that her van was not inside. Both Deel and Arnold found this very unusual because Robertson always closed her garage door. Later that afternoon, the neighbors observed all of Robertson's curtains closed, another unusual sighting. The neighbors then noticed that Robertson's garage door was closed, and assumed that she was home. However, attempts to reach Roberston via telephone were unsuccessful. Thus, Deel and Arnold went to Robertson's house, knocked on the door, but received no answer.

---

2. The trial court docket does not reflect a ruling on appellant's motion in limine, however, a later objection to the introduction of the letters was overruled at trial.

{¶9} Thereafter, the neighbors contacted Robertson's family. Her son, Scott Robertson ("Scott"), arrived at his mother's home around 7:15 p.m. Scott tried to enter the home via the code to the garage door pad, but was unsuccessful. He found a small, unlocked window, which Arnold climbed through in order to gain access into the residence. Inside, they found Robertson's home in disarray. Numerous items were scattered all over the floor, candles were burning, the front door was barricaded from the inside, and there was a strong smell of cleaning supplies. They also noticed that Robertson's van was missing from the garage. Thus, Arnold called 9-1-1.

{¶10} Sergeant Ralph Caswell ("Sergeant Caswell") with the Madison Township Police Department ("MTPD") was the first officer to arrive at Robertson's house. After determining that the home had been burglarized, Sergeant Caswell called for assistance to help him process the scene. He also issued a Silver Alert, i.e., a bulletin to notify the community when an elderly person is missing. Jamie Walsh ("Walsh"), a forensics examiner with the Lake County Crime Lab, and his team, later arrived at the residence and began processing the scene. Robertson's body was ultimately discovered in her bedroom, partially under her mattress and a pile of clothing.

{¶11} The following day, Dr. Erica Armstrong ("Dr. Armstrong") with the Cuyahoga County Coroner's Office performed an autopsy on Robertson's body. Dr. Armstrong determined that Robertson had sustained both blunt force and sharp force injuries to her head, trunk, arms, legs, abdomen, back, neck, and shoulders. Dr. Armstrong also determined that Robertson had been stabbed 94 times. Robertson's body also had some charring and some alteration by some type of chemical. It was not possible to narrow down the exact time of death. However, Dr. Armstrong indicated that

5

the time of death was consistent with information regarding when Robertson's friends last had contact with her and when her body was found.

{¶12} In addition to the foregoing evidence, it was also revealed at trial that prior to the discovery of Robertson's dead body at her home, appellant and her son, Zachary, were involved in an incident with the Euclid Police Department ("EPD"). Around 5:30 p.m. on June 13, 2012, Patrolman Donald Ivory ("Patrolman Ivory") with the EPD was on general patrol duty. He was patrolling a high drug activity area near Gold Werks, a local pawn shop.

{¶13} Patrolman Ivory observed a woman slumped over in the front seat of her vehicle. When Patrolman Ivory approached the woman to see if she needed any assistance, he saw that she was actually leaning over into the passenger seat and touching a magnet to several pieces of jewelry. He also saw a large box of jewelry on the floor of her vehicle. The woman indicated that the jewelry belonged to her son who was inside the pawn shop. Patrolman Ivory asked the woman for her identification. As she was going through her purse, Patrolman Ivory observed a syringe. The car was full of belongings and a digital scale was also observed inside of her purse. The woman was identified as appellant.

{¶14} Patrolman Ivory testified that after appellant's son exited Gold Werks, he told Patrolman Ivory that his name was "Gregory," that he did not have any identification on him, and that the jewelry in the car belonged to his mother. However, a later search of his person revealed that he did in fact have an identification card and that his name was Zachary Weimer. Both appellant and Zachary were arrested. Appellant's vehicle

was searched and towed. A strongbox was found in appellant's car bearing the name, "E. Robertson."

{¶15} Shorty after the Euclid incident, the EPD learned of a Silver Alert for a missing elderly woman in Madison Township named Eleanor Robertson and contacted the MTPD. Lieutenant Tim Brown ("Lieutenant Brown") with the MTPD testified that after speaking with Patrolman Ivory, he learned about the strongbox that was found in appellant's vehicle in Euclid with the name, "E. Robertson." Because the victim's name in the Madison Township case was "Eleanor Robertson," Lieutenant Brown and Detective Timothy Doyle ("Detective Doyle"), also with the MTPD, went to the EPD. They initially met with Patrolman Ivory and other EPD officers. Thereafter, Lieutenant Brown and Detective Doyle interviewed appellant and Zachary. Detective Doyle testified that appellant was not truthful when questioned by the officers.

{¶16} Investigation on the case continued. At trial, Nestor Angulo ("Angulo") and Patrick Finney ("Finney"), who both knew appellant and Zachary for a long time, along with Detective Elizabeth Kirk with the MTPD, collectively indicated that appellant and Zachary were drug abusers. To support their habits, appellant and Zachary would sell items at local pawn shops. Finney and Joseph Krizman ("Krizman"), who also knew appellant and Zachary, testified that appellant worked as a cleaning lady in exchange for drugs and money.

{¶17} Appellant's other son, Greg Weimer ("Greg"), and his live-in girlfriend, Erin Perkins ("Perkins"), testified that appellant and Zachary were always together and that appellant drove Zachary everywhere because he did not have a car. Greg indicated that appellant had been Robertson's neighbor for many years when she lived on

7

Canterbury Drive. At the time of this case, appellant resided on Sexton Road in Geneva, Ashtabula County, Ohio, with her boyfriend, Joe Skilthorpe, who installed a video surveillance system on the property. Greg further indicated that Zachary was living with him on Canterbury Drive, across the street from Robertson's house.

{¶18} Perkins and Megan Cool ("Cool"), another Canterbury Drive neighbor, saw appellant and Zachary at Greg's house shortly before noon on June 12, 2012. Cool observed appellant and Zachary outside of Greg's residence engaged in a loud argument with four or five people. According to Greg, appellant and Zachary subsequently left his home and went to Andover Bank to cash a forged check of Greg's for $100. Thereafter, Angulo testified that he received eight calls from Zachary. Angulo indicated that appellant and Zachary met with him because they wanted drugs. However, Angulo was unable to provide them with any.

{¶19} Further, Greg testified that the day before the argument at his house, Zachary had cashed a forged check of Greg's for $150. Greg additionally indicated that he had recently loaned Zachary $200. After finding out from the bank about the forged checks, Greg became angry. He demanded that he be paid back.

{¶20} Later on in the afternoon on June 12, 2012, Finney and Krizman indicated that appellant went to a house on Benjamin Road in Madison Township, which was occupied by several of Zachary's previous friends. Finney stated that Zachary briefly lived at that house until he was thrown out for stealing. According to Finney and Krizman, although Zachary was no longer welcome at the house, appellant was, and she would go there to cook and clean for the men in exchange for cash or drugs. Finney said that appellant did drugs every time she went there. During the afternoon at

8

issue, appellant went to buy drugs with two men from the Benjamin Road house, and later left the residence between 7:30 and 8:00 p.m.

{¶21} After appellant left the Benjamin Road house, cell phone records and video from her Sexton Road home surveillance system, which were admitted at trial as state's exhibits, reveal her movements and contact with Zachary. Appellant's cell phone hit off a tower near Robertson's house at 8:30 p.m. Appellant did not return to her own home until 9:46 p.m. Appellant and Zachary had frequent communication throughout the night and early morning hours via cell phone and text messages. At 4:44 a.m., on June 13, 2012, Zachary arrived at appellant's home on Sexton Road in Robertson's van. Zachary unloaded Robertson's belongings near appellant's vehicle. When he was finished, Zachary left appellant's house in Robertson's van to purchase drugs from Charles McElroy ("McElroy"). McElroy testified that Zachary called him three times on June 12 and eight times on June 13, 2012. McElroy said that Zachary bought heroin and was driving a van that he had never seen before.

{¶22} Zachary returned to appellant's home in Robertson's van at 10:56 a.m. Appellant helped Zachary dispose Robertson's van and sort through her property. They placed some of Robertson's belongings in appellant's car and some others in a safe in appellant's bedroom. Appellant and Zachary disposed some remaining items in a burn pile in appellant's backyard. Thereafter, appellant and Zachary took Robertson's property to Gold Werks in Euclid, where they were caught by Patrolman Ivory.

{¶23} After their arrest, Robertson's family members positively identified over 50 pieces of Robertson's jewelry and other household items, which were found in appellant's vehicle as well as in a locked safe in appellant's bedroom. In addition,

9

Robertson's son, Scott, and Robertson's daughter, Penny Borton, testified that Nutrigrain bars were missing from their mother's home. They indicated that Robertson always kept a basket on her counter containing between 20 and 40 Nutrigrain bars. They stated that Robertson would use scissors to cut the end of the wrappers. Detective Doyle and forensics examiner Walsh testified that a Nutrigrain bar wrapper with the same lot number as those missing from Robertson's home was found on appellant's bed. They also indicated that other Nutrigrain bar wrappers with ripped off ends were found in garbage cans in both Robertson's and appellant's homes.

{¶24} Further information concerning Robertson's murder was obtained from Richard Gould ("Gould"), a Lake County Jail inmate. Gould testified that he indicated to authorities that Zachary told him the following: Zachary and his "buddy" went to an elderly woman's home who had a safe with jewelry and cash; they knocked on the door and rushed into the house when she answered; Zachary stabbed the woman with a screw driver until he got tired, then moved her body to her bed; Zachary and his "buddy" barricaded the door, lit candles to make the death look accidental, rummaged through the home for anything they could sell, and cleaned the house with bleach to destroy any evidence; and they loaded up the woman's property into her van and left her house. According to Gould, Zachary did not reveal the identity of his "buddy."

{¶25} In addition to telling authorities about the foregoing information, Gould provided them with letters written by appellant and Zachary, which Gould stored for Zachary in Gould's jail cell. Additional letters were also recovered from appellant's and Zachary's cells. Collectively, the letters, which were admitted at trial as state's exhibits,

10

revealed an attempt to cover up the crimes. Appellant and Zachary discussed remaining silent and keeping their stories straight.

{¶26} Lastly, during the investigation involving Robertson, two other victims, Hatcher and Stroombeek, were discovered. Hatcher's name was on prescription medication bottles found in appellant's safe. Hatcher testified that appellant did not have his permission to take his medications. Also found in appellant's safe was medication and jewelry belonging to Stroombeek. Lisa Ungers ("Ungers") testified that Stroombeek is like a father to her. Ungers indicated that appellant had been Stroombeek's cleaning lady and caregiver. Ungers and Michael Cutler, a business associate of Stroombeek's, testified that appellant was fired after she made unauthorized purchases on Stroombeek's credit card, in addition to other behaviors and violations.

{¶27} At the close of the state's case, defense counsel moved for a Crim.R. 29 judgment of acquittal, which was denied by the trial court. Defense counsel renewed its Crim.R. 29 motion after it rested, which was again denied. The trial judge instructed the jury on the law, both sides gave closing arguments, and the case was submitted to the jury.

{¶28} Following deliberations, the jury returned guilty verdicts on all counts of the indictment. The trial court deferred sentencing and referred the matter to the Adult Probation Department for a pre-sentence investigation and report, a victim impact statement, and a drug and alcohol evaluation.

{¶29} On December 13, 2012, the trial court sentenced appellant to the following: count 1, 12 months in prison; count two, 120 days in jail (merged with all

11

felony sentences); count three, 12 months in prison; count 4, 120 days in jail (merged with all felony sentences); count 5, 18 months in prison; count 6, 12 months in prison; count 7, 12 months in prison; count 8, 12 months in prison; count 9, 120 days in jail (merged with all felony sentences); count 10, 12 months in prison; count 11, 18 months in prison; count 12, 18 months in prison; count 13, 36 months in prison; count 14, 36 months in prison; count 15, 11 years in prison; count 16, a life sentence with parole eligibility after 30 years; and count 17, 11 years in prison. Counts 13, 16, and 17 are to be served consecutive to each other and concurrent to the sentences imposed on all other counts for a total of 44 years to life in prison. Appellant filed a timely appeal **on** January 11, 2013 asserting the following assignments of error:

{¶30} "[1.] The trial court erred by failing to grant a judgment of acquittal, pursuant to Crim.R. 29(A), on the charges of aggravated burglary and aggravated murder, and thereafter entering a judgment of conviction of those offenses which was not supported by sufficient evidence, in derogation of Defendant's right to due process of law, as protected by the Fourteenth Amendment to the United States Constitution.

{¶31} "[2.] The trial court erred by entering a judgment of conviction of aggravated burglary and aggravated murder that was against the manifest weight of the evidence, in derogation of Defendant's right to due process of law, as protected by the Fourteenth Amendment to the United States Constitution.

{¶32} "[3.] The trial court erred by failing to grant a judgment of acquittal, pursuant to Crim.R. 29(A), on the charge of engaging in a pattern of corrupt activity, thereby entering a judgment of conviction of that offense which was not supported by

12

sufficient evidence, in derogation of Defendant's right to due process of law, as protected by the Fourteenth Amendment to the United States Constitution.

**{¶33}** "[4.] The trial court erred by entering a judgment of conviction of engaging in a pattern of corrupt activity that was against the manifest weight of the evidence, in derogation of Defendant's right to due process of law, as protected by the Fourteenth Amendment to the United States Constitution.

**{¶34}** "[5.] The trial court erred in admitting hearsay evidence concerning statements made by a co-defendant, in violation of Defendant's right to confrontation, as protected by the Sixth Amendment to the United States Constitution."

**{¶35}** As stated, the Ohio Supreme Court vacated our entire decision in *Weimer*, 2014-Ohio-2882, and remanded the matter back to this court to consider the evidence of an enterprise in light of *Beverly,* 2015-Ohio-219, which was pending at the time of this court's decision. *Weimer,* 2015-Ohio-3378. Thus, in addition to the enterprise issue in light of *Beverly* solely underlying appellant's third and fourth assignments of error, this court, for clarity, will also re-address appellant's first, second, and fifth assignments of error. Upon review and for the reasons stated, this court again affirms in part, reverses in part, vacates in part, and remands the judgment of the trial court.

**{¶36}** We note that appellant does not take issue with the suppression or her sentence. Rather, appellant's appeal centers around issues related to her trial. For ease of discussion, we will address appellant's assignments of error out of order. Appellant's first and fifth assignments are interrelated. Thus, we will discuss them in a consolidated fashion beginning with the fifth assignment.

{¶37} In her fifth assignment of error, appellant argues that the trial court erred in admitting hearsay evidence concerning statements made by Zachary, her co-defendant, in violation of her right to confrontation, as protected by the Sixth Amendment to the United States Constitution.

{¶38} In her first assignment of error, appellant argues that the trial court erred in failing to grant her Crim.R. 29(A) judgment of acquittal on the charges of aggravated burglary and aggravated murder, against the sufficiency of the evidence.

{¶39} The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right (* * *) to be confronted with the witnesses against him (* * *)." The United States Supreme Court, in *Crawford v. Washington*, 541 U.S. 36, 51 (2004), determined the Confrontation Clause "applies to 'witnesses' against the accused – in other words, those who 'bear testimony.'" The Supreme Court held the right to confrontation applies to all "testimonial statements." *Id.* at syllabus. To determine whether a statement is testimonial in nature, the proper inquiry is "'whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime.'" *State v. Metter*, 11th Dist. Lake No. 2012-L-029, 2013-Ohio-2039, ¶35, quoting *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir.2004).

{¶40} "Where *nontestimonial* hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law — as does [*Ohio v. Roberts*, 448 U.S. 56 (1980)], and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. Where *testimonial* evidence is at issue, however, the Sixth Amendment demands what the common law

14

required: unavailability and a prior opportunity for cross-examination." (Emphasis added.) *Crawford* at 68. In *Crawford*, the Supreme Court noted that a statement made in furtherance of a conspiracy is an example of an inherently non-testimonial statement. *Id.* at 56.

**{¶41}** With regard to appellant's evidence argument, hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Hearsay is inadmissible at trial, unless it falls under an exception to the Rules of Evidence. Evid.R. 802. Evid.R. 801(D)(2)(e) provides that hearsay does not include "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy."

**{¶42}** While in jail awaiting trial, Zachary allegedly made statements to Gould, also a Lake County Jail inmate. Zachary told Gould that he went to Robertson's door, she answered, and he bum-rushed her and entered the home. Zachary also told Gould that "him and his buddy" were at Robertson's home; that after he stabbed Robertson, "him and his buddy" then put her in a bed and were going to cover-up the crime; and that "his buddy" cleaned the blood that was left around the house. Zachary never revealed the identity of "his buddy."

**{¶43}** Zachary's statements concerning the crime were not made for later use in a prosecution, and thus, the statements are inherently nontestimonial. Co-conspirator statements are inherently nontestimonial because the purpose for making the statements is not for later use at trial. *See United States v. Mooneyham*, 473 F.3d 280, 286 (6th Cir.2007) (applying *Crawford* to co-conspirator statements). Moreover, as

15

stated, the *Crawford* Court specifically identified statements in furtherance of a conspiracy as examples of statements that are inherently nontestimonial. *See Crawford* at 56.

**{¶44}** Here, statements made to Gould were admitted into evidence presumably under the theory that they were statements by a co-conspirator made in furtherance of the conspiracy, which are not hearsay statements. Again, Evid.R. 801(D)(2)(e) indicates that a statement is not hearsay if it is "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy." Statements testified to by Gould were not made during the course of the conspiracy. Assuming however arguendo the statements were made during the course of the alleged conspiracy, the statements were not made in "furtherance" of the alleged conspiracy in an effort to conceal it. "A conspiracy does not necessarily end with the commission of the crime. A statement made by a co-conspirator after the crime may be admissible under Evid.R. 801(D)(2)(e) if it was made in an effort to conceal the crime." *State v. Braun*, 8th Dist. Cuyahoga No. 91131, 2009-Ohio-4875, ¶109. (Citation omitted.) Appellant asserts the trial court erred in admitting Gould's testimony, as it is not excluded as hearsay by Evid.R. 801(D)(2)(e), because Zachary's statements to Gould were not made in an effort to conceal the crime.

**{¶45}** In general, a co-conspirator's statements to a third party which simply describe the events that occurred are not made in furtherance of the conspiracy. *Braun*, *supra*, at ¶113. For example, in *Braun*, the Eighth Appellate District determined the trial court erred in its admission of statements made by a co-conspirator to an individual while they shared the same pod in the Cuyahoga County Jail. The co-conspirator

16

bragged about the death of the victim, stating that he and the appellant called the victim for drugs and to set up a robbery. The co-conspirator relayed that he and the appellant robbed the victim, shot the victim, then disposed of the victim's body and the bloody vehicle. The victim was found with two gunshots in the head in a burning vehicle. The Eighth Appellate District found that the aforementioned statements bragging about the murder were not made in furtherance of the conspiracy and thus inadmissible.

{¶46} Akin to the statements in *Braun*, Zachary's statements to Gould were not made in furtherance of the conspiracy, but were a recitation of events that occurred prior to, during, and immediately following her murder. The admission of Gould's statements violated appellant's rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

{¶47} Although the trial court committed constitutional error, such error can be harmless in certain circumstances.

{¶48} "A constitutional error can be held harmless if we determine that it was harmless beyond a reasonable doubt. Whether a Sixth Amendment error was harmless beyond a reasonable doubt is not simply an inquiry into the sufficiency of the remaining evidence. Instead, the question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, ¶78. (Citation omitted.)

{¶49} Appellant was charged with aggravated burglary, a felony of the first degree, in violation of R.C. 2911.11(A)(1), which states: "[n]o person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or

17

separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if * * * [t]he offender inflicts, or attempts or threatens to inflict physical harm on another[.]"

{¶50} Appellant was also charged with aggravated murder, an unclassified felony, in violation of R.C. 2903.01(B), which states: "[n]o person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, trespass in a habitation when a person is present or likely to be present, terrorism, or escape."

{¶51} In this case, appellant was prosecuted under a theory of complicity. "To support a conviction for complicity by aiding and abetting * * *, the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Johnson*, 93 Ohio St.3d 240, syllabus (2001). "Such intent may be inferred from the circumstances surrounding the crime." *Id.* "Criminal intent * * * can be inferred from the presence, companionship and conduct of a criminal defendant both before and after the offense is committed, *State v. Pruett* (1971), 28 Ohio App.2d 29, 34, * * *, and may be proven by either direct or circumstantial evidence. *See State v. Mootispaw* (1996), 110 Ohio App.3d 566, 570, * * *; *State v. Cartellone* (1981), 3 Ohio App.3d 145, 150, * * *." *State v. Nievas*, 121 Ohio App.3d 451, 456-457 (8th Dist.1997). (Parallel citations omitted.)

18

{¶52} At trial, the state's position was that appellant was apparently *either* waiting around to pick up Zachary or helping him at Robertson's house. The state argued at trial that appellant, who was Robertson's neighbor for many years, was the mastermind behind "the plan." As stated, on the day of the burglary and Robertson's murder, two neighbors, Perkins and Cool, saw appellant and Zachary shortly before noon at Greg's Canterbury Drive home, across the street from Robertson's house. Cool observed appellant and Zachary outside of Greg's residence engaged in a loud argument with four or five people. Finney and Krizman, along with Dustin May and Mark Pfouts, testified that Zachary would steal, use other people's drugs, and owed drug money.

{¶53} According to Greg, appellant and Zachary subsequently left his home and went to Andover Bank to cash a forged check of Greg's, the second forged check in two days. After finding out from the bank about the forged checks, Greg became angry. He demanded that he be paid back. Zachary promised to pay Greg back for the money he took. Thereafter, Angulo testified that he received eight calls from Zachary. Angulo indicated that appellant and Zachary met with him because they wanted drugs. However, Angulo was unable to provide them with any. Appellant and Zachary were in desperate need for money to pay back Greg as well as for money to buy other drugs.

{¶54} Around 2:30 that afternoon, appellant's cell phone hit off a cell tower near Robertson's house. The state theorized that one could reasonably conclude that appellant dropped off Zachary at or near Robertson's home. Finney and Krizman indicated that appellant later went to the Benjamin Road house to do drugs. While there, she and Zachary exchanged text messages. Appellant texted Zachary that she

19

was going home and he responded that he would talk to her later. Appellant left the Benjamin Road residence between 7:30 and 8:00 p.m. Around 8:30 p.m., appellant's cell phone again hit off a cell tower near Robertson's house. Around 9:15 p.m., appellant texted Zachary wondering if everything was okay between him and Greg. Zachary did not respond to her text. Appellant returned to her own home on Sexton Road at 9:46 p.m.

{¶55} Shortly after 10:00 p.m., appellant sent a text message to Zachary for him to call her "ASAP." At 10:18 p.m., appellant called Zachary. They spoke for 95 seconds. At 10:49 p.m., Zachary called her back. They conversed for 46 seconds. Between these calls, appellant was seen on the surveillance video exiting her house, looking at the cameras and different locations around the driveway near her vehicle. Appellant and Zachary exchanged six more phone calls between 11:16 p.m. and 11:25 p.m.

{¶56} At 11:51 p.m., appellant texted Zachary indicating that she was tired and could not stay awake much longer. Zachary did not respond. Appellant sent two more texts shortly after midnight on June 13, 2012, indicating for him to let her know if he needed a ride because she was tired. Zachary did not respond. At 12:45 a.m., appellant texted Zachary that she was going to bed and asked if she should leave the door opened for him. He did not respond.

{¶57} At 4:18 a.m., Zachary called appellant. They spoke for 23 seconds. Zachary called her again at 4:36 a.m. They talked for 377 seconds. At 4:44 a.m., Zachary arrived at appellant's home on Sexton Road in Robertson's van. Video surveillance showed Zachary unloading Robertson's belongings near appellant's vehicle

20

and placing bags in a garbage can. While there, appellant called Zachary's cell phone. They conversed for 38 seconds. At 5:22 a.m., Zachary left appellant's house in Robertson's van to purchase drugs from McElroy with money stolen from Robertson. Zachary called appellant at 5:32 a.m. They talked for 135 seconds. McElroy testified that Zachary called him three times on June 12 and eight times on June 13, 2012. McElroy said that Zachary bought heroin and was driving a van that he had never seen before.

{¶58} At 9:04 a.m., Zachary called appellant. They spoke for 119 seconds. Between 10:13 a.m. and 10:56 a.m., they were in contact 10 more times. At 10:56 a.m., Zachary returned to appellant's home in Robertson's van. Around 11:15 a.m., appellant and Zachary left her house. Appellant drove her own vehicle and Zachary drove Robertson's van. For the next 13 minutes, they were in constant contact. In one text message, appellant provided Zachary with directions, telling him to "take next left." After appellant helped Zachary dispose Robertson's van, they returned to appellant's Sexton Road residence at 12:07 p.m. in her vehicle.

{¶59} As captured on video surveillance, appellant and Zachary then sorted through Robertson's property. They placed some of it in appellant's vehicle, some in her locked safe, and disposed the rest of it in a burn pile in her backyard. Thereafter, appellant and Zachary took Robertson's property to Gold Werks in Euclid, to sell for drug money, where they had an encounter with Patrolman Ivory. Appellant was caught at that time with some of Robertson's property in her car. Later, Robertson's other property was discovered in appellant's locked safe. Also, a half-eaten Nutrigrain bar from Robertson's house was discovered on appellant's bed.

21

**{¶60}** After their arrests, appellant lied to police when asked if Zachary had a cell phone. Appellant also lied to police that she did not know Robertson, her neighbor of many years.

**{¶61}** The state also presented the testimony of Gould. To support the charge of aggravated burglary, the state emphasized Gould's testimony that Zachary informed Gould that he bum-rushed Robertson, forcibly entered her home, and murdered her.

**{¶62}** Gould's testimony was also the only evidence that suggested another individual was, in fact, in Robertson's home prior to, during, and after the murder. Although Zachary never revealed the identity of "his buddy," the state linked Zachary's use of the term "buddy" with the letters exchanged between Zachary and appellant while both were incarcerated. Specifically, in her closing argument, the prosecutor stated: "Again, the tone of the letter, my bear cub forever, you're my best friend forever. You'll always be my buddy. Interesting use of the words, buddy. Especially when you listen to Gould's statement where Zac Weimer said me and my buddy committed this offense."

**{¶63}** Additionally, the fact that these statements were the only evidence suggesting there was, in fact, a conspiracy also brings into focus the last phrase of Evid.R. 801(D)(2)(e): "upon independent proof of the conspiracy." Even if the statements could be construed as being made "in furtherance" of the conspiracy, they would constitute hearsay, and therefore be inadmissible, unless there was independent proof that there was, in fact, a conspiracy.

**{¶64}** Based on the evidence presented at trial, we conclude there was a reasonable possibility that Gould's testimony contributed to appellant's convictions for

aggravated murder and aggravated burglary. As noted, the state presented other evidence as to these charges, but the evidence that placed appellant in the home prior to, during, and after the murder was impermissibly admitted.

**{¶65}** Accordingly, we remand the matter to the trial court to conduct a new trial with respect to the charges of aggravated murder and aggravated burglary.

**{¶66}** Appellant's first assignment of error is overruled and her fifth assignment of error has merit.

**{¶67}** In her second assignment of error, appellant contends that the trial court erred in entering a judgment of conviction for aggravated burglary and aggravated murder, against the manifest weight of the evidence. Based on the disposition of appellant's first and fifth assignments of error, her second assignment of error is moot.

**{¶68}** In her third assignment of error, appellant alleges that the trial court erred in failing to grant her Crim.R. 29(A) motion for judgment of acquittal on the charge of engaging in a pattern of corrupt activity, against the sufficiency of the evidence. As stated, the Ohio Supreme Court has ordered this court to consider the evidence of an enterprise in light of *Beverly*, 2015-Ohio-219, which was pending at the time of this court's decision in *Weimer*, 2014-Ohio-2882. *Weimer*, 2015-Ohio-3378.

**{¶69}** With regard to sufficiency, in *State v. Bridgeman*, 55 Ohio St.2d 261 (1978), the Ohio Supreme Court established the test for determining whether a Crim.R. 29 motion for acquittal is properly denied. The Court stated that "[p]ursuant to Crim.R. 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." *Id.* at syllabus.

23

"Thus, when an appellant makes a Crim.R. 29 motion, he or she is challenging the sufficiency of the evidence introduced by the state." *State v. Patrick*, 11th Dist. Trumbull Nos. 2003-T-0166 and 2003-T-0167, 2004-Ohio-6688, ¶18.

{¶70} As this court stated in *State v. Schlee*, 11th Dist. Lake No. 93-L-082, 1994 Ohio App. LEXIS 5862, *13-14 (Dec. 23, 1994):

{¶71} "'Sufficiency' challenges whether the prosecution has presented evidence on each element of the offense to allow the matter to go to the jury, while 'manifest weight' contests the believability of the evidence presented.

{¶72} "'"The test (for sufficiency of the evidence) is whether after viewing the probative evidence and the inference[s] drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all of the elements of the offense beyond a reasonable doubt. *The claim of insufficient evidence invokes an inquiry about due process. It raises a question of law, the resolution of which does not allow the court to weigh the evidence.*"'

{¶73} "In other words, the standard to be applied on a question concerning sufficiency is: when viewing the evidence 'in a light most favorable to the prosecution,' '(a) reviewing court (should) not reverse a jury verdict where there is substantial evidence upon which the jury could reasonably conclude that all of the elements of an offense have been proven beyond a reasonable doubt.'" (Emphasis sic.) (Citations omitted.)

{¶74} "[A] reviewing court must look to the evidence presented * * * to assess whether the state offered evidence on each statutory element of the offense, so that a rational trier of fact may infer that the offense was committed beyond a reasonable

24

doubt." *State v. March*, 11th Dist. Lake No. 98-L-065, 1999 Ohio App. LEXIS 3333, *8 (July 16, 1999). The evidence is to be viewed in a light most favorable to the prosecution when conducting this inquiry. *State v. Jenks*, 61 Ohio St.3d 259, paragraph two of the syllabus (1991). Further, the verdict will not be disturbed on appeal unless the reviewing court finds that reasonable minds could not have arrived at the conclusion reached by the trier of fact. *State v. Dennis*, 79 Ohio St.3d 421, 430 (1997).

{¶75} Appellant was charged with engaging in a pattern of corrupt activity, a felony of the first degree, in violation of R.C. 2923.32(A)(1), which states: "[n]o person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt."

{¶76} R.C. 2923.31(E) defines a "pattern of corrupt activity" as "two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event."

{¶77} R.C. 2923.31(C) defines "enterprise" to include "any individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity. 'Enterprise' includes illicit as well as licit enterprises."

{¶78} In the instant matter, appellant challenges both the elements of "enterprise" and "pattern of corrupt activity." She contends that these elements are

25

separate and asserts that proof of one does not establish the other. Appellant also asserts that she and Zachary acted "separately."

{¶79} On January 27, 2015, the Ohio Supreme Court decided *Beverly*, 2015-Ohio-219. We are called upon to consider the evidence of an enterprise in light of *Beverly* which raised the issue of whether, in establishing the existence of the enterprise element in Ohio's Engaging in a Pattern of Corrupt Activity statute, the state is required to prove that the enterprise has an existence separate and distinct from the pattern of corrupt activity in which it engaged.

{¶80} In *Beverly,* the Ohio Supreme Court stated the following regarding RICO and proving "enterprise" in Ohio:

{¶81} "* * * Today, we conclude, in essence, that a 'pattern of corrupt activity' does not merge with the concept of 'enterprise.'

{¶82} "There is no question that a RICO conviction depends on the state being able to 'prove both the existence of an "enterprise" and the connected "pattern of racketeering activity."' * * * The question in this case is whether the same evidence can be used to prove both the existence of an enterprise and the associated pattern of corrupt activity. We conclude that it can and, therefore, also conclude that the state is not required to prove that the defendants were associated with an organization having an existence as an entity or structure separate and distinct from the pattern of activity in which it engages.

{¶83} "Nothing in R.C. Chapter 2923 implicitly or explicitly states that an enterprise and a pattern of corrupt activity must be proven with separate evidence. The definition of 'enterprise' is remarkably open-ended. * * *

26

**{¶84}** "* * *

**{¶85}** "* * * We agree * * * that proof of one essential element does not 'necessarily' prove another. But we emphasize that, logically, evidence that proves one of the elements can sometimes prove the other, even though it doesn't necessarily do so.

**{¶86}** "* * *

**{¶87}** "We hold that the existence of an enterprise, sufficient to sustain a conviction for engaging in a pattern of corrupt activity under R.C. 2923.32(A)(1), can be established without proving that the enterprise is a structure separate and distinct from a pattern of corrupt activity.

**{¶88}** "* * * We have relied on *Turkette* and *Boyle* for guidance * * * because the reasoning applied by the Supreme Court is logical and apt. * * *

**{¶89}** "* * *

**{¶90}** "The record is replete with examples of Beverly and Imber associating together for a common purpose of engaging in a course of conduct. Beverly and Imber drove (and perhaps stole) an Ohio Department of Transportation truck and used it to steal an expensive stump grinder. They used a stolen Chevrolet Caprice in the course of an attempted burglary. And most notoriously, for purposes of this case, they used a stolen truck to commit several burglaries on January 28, 2011. It is clear to us that the record provides ample support for a rational trier of fact to conclude that Beverly and Imber constituted an association-in-fact enterprise and that they engaged in a pattern of corrupt activity. Indeed, we cannot imagine a trier of fact concluding otherwise." *Beverly*, 2015-Ohio-219, ¶6-16.

27

{¶91} Again, with respect to the aggravated burglary and aggravated murder, we have concluded "there was a reasonable probability that Gould's testimony contributed to appellant's convictions for aggravated murder and aggravated burglary." Accordingly, the convictions on those charges should be vacated and a remand is appropriate in order to conduct a new trial on those charges.

{¶92} Regarding appellant's third assignment of error with respect to Count 17, engaging in a pattern of corrupt activity, we hold that the conviction on this count should be vacated and a remand is also appropriate in order to conduct a new trial on this charge.

{¶93} At trial, the judge provided the jury with nearly 36 pages of jury instructions. "Jury instructions are critically important to assist juries in determining the interplay between the facts of the case before it and the applicable law." *State v. Griffin*, 141 Ohio St.3d 392, 393. With respect to Count 17, the jury was instructed to consider all of the counts in the indictment including Count 15, aggravated burglary, and Count 16, aggravated murder. The trial court instructed, inter alia, that the jury was to consider the following:

{¶94} "predicate acts constituting the pattern of corrupt activity of said enterprise being criminal violations of Aggravated Murder as set forth in Count 16, and/or Aggravated Burglary as set forth in Count 15, and/or Tampering with Evidence as set forth in Counts 13 and/or 14, and/or Receiving Stolen Property as set forth in Counts 1, 2, 3, 4, 11, and/or other controlled substances and/or dangerous drugs as set forth in Counts 5, 6, 7, 8, 9, and/or 10, and/or uncharged offenses of Murder, Felonious Assault, Aggravated Robbery, Robbery, and/or Theft."

28

{¶95} The jury was also instructed to consider Counts 15 and 16 when considering the definitions of "enterprise" and "corrupt activity." The jury was ordered to follow the jury instructions. We must presume the instructions were followed. Appellant's conviction on Count 17, therefore, was premised upon the following of the aforementioned instruction which includes consideration of the evidence which lead to the convictions for aggravated murder and aggravated burglary. It is impossible to determine whether the jury relied on this evidence when finding appellant guilty on Count 17.

{¶96} In *Beverly*, the Ohio Supreme Court clarified, and broadened, what is sufficient to constitute an "enterprise." Based on this clarification in *Beverly*, while there may have been sufficient evidence with the inclusion of the convictions for aggravated murder and aggravated burglary to support a conviction, without those convictions, we are unable to determine whether the state presented sufficient evidence for this charge, i.e., Count 17, engaging in a pattern of corrupt activity. To hold otherwise would require this court to selectively speculate on the evidence the jury considered. This, however, we cannot do. Under the circumstances presented in this case, we cannot say whether the state presented sufficient evidence to support a conviction for engaging in a pattern of corrupt activity.

{¶97} In her fourth assignment of error, appellant maintains that the trial court erred in entering a judgment of conviction for engaging in a pattern of corrupt activity, against the manifest weight of the evidence.

{¶98} Based on our foregoing analysis in appellant's third assignment of error, we find her fourth assignment of error to be moot.

29

{¶99} For the foregoing reasons, the judgment of the Lake County Court of Common Pleas is again affirmed in part, reversed in part, vacated in part, and remanded for further proceedings. Specifically, the judgment is affirmed with respect to Counts 1 through 14. The matter is remanded to the trial court for a new trial with respect to Count 15, aggravated burglary, Count 16, aggravated murder, and Count 17, engaging in a pattern of corrupt activity conviction.

TIMOTHY P. CANNON, J., concurs,

DIANE V. GRENDELL, J., concurs in part and dissents in part, with a Dissenting Opinion.

_____

DIANE V. GRENDELL, J., concurs in part and dissents in part, with a Dissenting Opinion.

{¶100} I concur with the majority's conclusion that Danna's convictions on counts 1-14 remain valid, since no assignments of error were raised in relation to these counts. I dissent as to the majority's analysis and the decision to order a new trial on Danna's convictions for Engaging in a Pattern of Corrupt Activity, Aggravated Burglary, and Aggravated Murder. There was sufficient evidence to support these convictions and any error related to the admission of testimony in this case was harmless.[3]

_____

3. Since the Supreme Court vacated this court's original judgment on appeal based on the authority of *State v. Beverly*, 143 Ohio St.3d 258, 2015-Ohio-219, 37 N.E.3d 116, and the majority reasserts its analysis for the entire matter on remand, it is necessary to include a full discussion of the merits of Danna's appeal in this opinion.

{¶101} Regarding the fifth assignment of error, I disagree with the conclusion that a new trial should be held on the Aggravated Burglary and Aggravated Murder charges. The majority's determination is based on the conclusion that the testimony of a witness, Richard Gould, that Zachary had a "buddy" present at the scene of the murder was impermissibly admitted and contributed to Danna's convictions.

{¶102} The majority concludes that Gould's testimony regarding Zachary's statements was inadmissible and did not fall under the co-conspirator hearsay exception, since the statements were not made in furtherance of a conspiracy. Regardless of this, the admission of the statements amounted to harmless error and a new trial is not warranted.

{¶103} Regarding the assertion that these statements harmed Danna, since they placed her at the victim's home, there was already evidence in the record to place her at or near the victim's house on the date of the crimes. This evidence includes cell phone records and testimony that she was at a neighboring home. Testimony about the extensive number of items taken from the victim's home and the lack of physical evidence provide support for the State's theory that Zachary received assistance in cleaning and potentially removing items from the home. This is reinforced by video evidence showing Danna retrieving cleaning supplies from her home on the date of the murder.

{¶104} It must also be emphasized that Gould never actually identified Danna as being the second person present with Zachary at the home and he repeatedly testified that Zachary never implicated Danna. The majority contends that Gould identified the second individual as Zachary's "buddy" and that this is significant since Danna referred

to Zachary as her buddy. However, Gould used the term "buddy" to identify other individuals in his testimony, so it is unclear whether Zachary himself used this term when describing the second individual. In either case, the use of this term did not provide additional support for the conclusion that it was Danna in the home.

{¶105} Importantly, the State was not required to prove that Danna was at the scene at the time of the murder. The murder charge was based on a theory of complicity, in which Danna aided and abetted and/or solicited the crimes. R.C. 2923.03. A conviction on such grounds is appropriate when "'the evidence * * * show[s] that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal.'" (Citation omitted.) *In re T.K.*, 109 Ohio St.3d 512, 2006-Ohio-3056, 849 N.E.2d 286, ¶ 13. Intent can be inferred from "the presence, companionship, and conduct of the defendant before and after the offense is committed." *Id.*

{¶106} The jury had before it a multitude of evidence tying Danna to the Aggravated Burglary and Aggravated Murder convictions, rendering the admitted statements harmless. *See State v. Boles*, 11th Dist. Ashtabula No. 2013-A-0026, 2014-Ohio-744, ¶ 35 (where there is an abundant amount of evidence of guilt, the improper admission of evidence is harmless error). Danna was seen repeatedly with Zachary on the date of the murder, and provided him with a ride on that day. Testimony showed that Zachary did not have a car and used Danna for transportation. Danna was in continued communication with Zachary on that date, supporting a conclusion that the two worked together to carry out the murder and the theft. Danna had been the victim's neighbor for a period of years, which would lead to a conclusion that she had

32

participated in planning the attack. Much of the victim's stolen property was taken to Danna's home and she participated in the selling or disposal of many items. With all of this evidence, regardless of whether the testimony placed Danna at the scene of the crime, the convictions for Aggravated Burglary and Aggravated Murder were still supported by sufficient evidence.

{¶107} Regarding the third assignment of error, the majority concludes that the Engaging in a Pattern of Corrupt Activity conviction should also be remanded for a new trial. This is based on the argument that the conviction for Engaging in a Pattern of Corrupt Activity was influenced by the jury instruction to consider the Aggravated Murder and Aggravated Burglary charges when determining whether Danna engaged in a pattern of activity, and these convictions have now been vacated.

{¶108} It should be emphasized that this "jury instruction" analysis was not raised in the appellant's brief, nor does it appear to be reliant upon the *Beverly* decision such that it should be raised by this court at the present stage of the proceedings. Regardless, given that the Aggravated Murder and Aggravated Burglary convictions were proper for the reasons outlined extensively above, a retrial of the Engaging in a Pattern of Corrupt Activity charge for the reasons advanced by the majority is unwarranted. This being the case, it is also necessary to emphasize the valid and sufficient grounds supporting Danna's conviction for this charge.

{¶109} Danna was convicted of Engaging in a Pattern of Corrupt Activity based on her ongoing and dangerous course of criminal conduct with her son, Zachary Weimer, which included theft, the sale of stolen goods, the use of such money to purchase drugs, and the murder of the victim in this case.

**{¶110}** A pattern of corrupt activity is one that involves two or more incidents related to affairs of the same enterprise. R.C. 2923.31(E). An enterprise includes "any individual, * * * or group of persons associated in fact although not a legal entity," encompassing "illicit as well as licit enterprises." R.C. 2923.31(C). "[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose." *State v. Perry*, 11th Dist. Lake No. 2011-L-125, 2012-Ohio-4888, ¶ 98. The facts of the present case fall under this definition of an enterprise.

**{¶111}** Danna and Zachary worked together in the murder of the victim, enabling them to commit the theft of an extensive amount of items from her home, which they planned to sell, presumably to obtain money for the purchase of drugs. There was testimony that Danna and Zachary use drugs with each other, are frequently seen together, and had pooled money in the past in order to purchase drugs. Both individuals had stolen items from multiple victims, and the two stole jointly from the murder victim. They went to the same pawn shop, both together and separately, to sell stolen items to facilitate their drug use. This activity is properly classified as an association-in-fact, given that the two worked together and independently to obtain drug money through criminal means, furthering a common purpose over a continuing period of time. The murder in this case solidifies this association and establishes the link between their activities.

**{¶112}** There is no specific case law prohibiting a conviction for Engaging in a Pattern of Corrupt Activity in circumstances similar to the present case. Courts have upheld convictions when a pattern of theft occurred and two individuals were working together for the purposes of perpetrating the crimes. For example, this court has found

that a pattern of corrupt activity can occur when two individuals were known to work jointly in at least one burglary and were found together, in the same car, with stolen items and burglary tools. *Perry* at ¶ 111-112. *See also State v. Elersic*, 11th Dist. Lake Nos. 2000-L-062 and 2000-L-164, 2001 Ohio App. LEXIS 5210, 15-16 (Nov. 21, 2001), citing *State v. Grimm*, 102 Ohio App.3d 356, 657 N.E.2d 318 (2nd Dist.1995) (two parties working together to steal items in the course of multiple thefts were associated in an enterprise). While Danna and Zachary may have committed some separate thefts, they still utilized those thefts to support their common goal of selling the items to purchase drugs.

{¶113} Further, while charges under this statute often involve large criminal enterprises, it does not follow that the facts of this case do not also fall under the statutory requirements and warrant such a conviction. *State v. Gregg*, 11th Dist. Ashtabula No. 2006-A-0013, 2007-Ohio-1201, ¶ 29 ("there is no requirement that 'an enterprise must be a formal, structured organization'").

{¶114} The Supreme Court's decision in *Beverly* serves to further strengthen the foregoing arguments that Danna's conviction should be affirmed. In *Beverly,* the Ohio Supreme Court solidifies the fact that an "enterprise" should be given a liberal interpretation, holding that the same evidence can be used to prove both the existence of a pattern of corrupt activity and an enterprise. The *Beverly* Court clarifies that the State is not required to prove the defendants were part of "an entity or structure" separate from their criminal activities. 143 Ohio St.3d 258, 2015-Ohio-219, 37 N.E.3d 116, at ¶ 7. Although there is no specific "structure" to Danna and Zachary's enterprise, their activities still constituted Engaging in a Pattern of Corrupt Activity.

{¶115} For the foregoing reasons, I respectfully dissent from the majority's decision to order a new trial for the Aggravated Burglary, Aggravated Murder, and Engaging in a Pattern of Corrupt Activity charges. I agree, however, that there is no basis for reversing the other 14 convictions.